# UNITED STATES DISTRICT COURT

## MIDDLE DISTRICT OF LOUISIANA

DAJA NATHAN                                          CIVIL ACTION

VERSUS                                              17-118-SDD-RLB

PNK (BATON ROUGE) PARTNERSHIP

## RULING

This matter is before the Court on the *Motion for Summary Judgment*[1] filed by Defendant, PNK Partnership, d/b/a L'Auberge Casino & Hotel Baton Rouge ("L'Auberge or "Defendant").  Plaintiff, Daja Nathan ("Plaintiff") has filed an *Opposition*[2] to this motion, to which Defendant filed a *Reply*.[3]  For the reasons which follow, the Court finds that Defendant's motion should be granted.

## I.      FACTUAL AND PROCEDURAL BACKGROUND

Defendant hired Plaintiff in September of 2015 for the position of MyChoice Representative at L'Auberge Casino & Hotel in Baton Rouge, Lousiana.[4]  Plaintiff alleges her duties in this position included, *inter alia*:  "guest services; answering any questions any guests may have regarding promotional giveaways, bonuses on cards, writing vouchers; checking in VIP guests and assisting the marketing team with VIP giveaways."[5]

---

[1] Rec. Doc. No. 32.
[2] Rec. Doc. No. 33.
[3] Rec. Doc. No. 36.
[4] Rec. Doc. Nos. 32-2 &  32-3.
[5] Rec. Doc. No. 33-32 at 3, ¶ 10.  An exhaustive job description for a MyChoice Representative is set forth in Rec. Doc. No. 32-4.
Document Number: 48610

Jury

Plaintiff alleges that her immediate supervisor was Nakisha Growe ("Growe"), an African-American female, and Growe's supervisor was Erica White ("White"), a Caucasian female.[6] Plaintiff claims that, from the time she began working for Defendant, she noticed White treating minority employees differently than others she supervised.[7] Plaintiff claims that White "habitually targeted, harassed and intimidated minorities under her supervision," and that other minority employees complained about White's treatment.[8]

Several weeks into her seven-month employment, Plaintiff claims an incident occurred between Plaintiff and White's friend, Sarah Savoy ("Savoy"), who was also a Caucasian female manager employed by Defendant.[9] Specifically, Plaintiff alleges Savoy offered Plaintiff candy from her purse, but Plaintiff did not accept, which allegedly resulted in Plaintiff being verbally reprimanded by Savoy, who allegedly "coached" her that she should accept things when offered.[10] Following this incident, Plaintiff contends White "targeted, harassed, retaliated and intimidated" Plaintiff regarding her job performance.[11] Plaintiff claims that White instructed Growe "to write her up" on various occasions[12] for coming in late[13] and for violating the internet policy by being on Facebook during working hours.[14] Plaintiff argues these write ups were not warranted because she was not late on the date in question as her work schedule had been previously changed, and there was no internet policy preventing Facebook usage during work – as several other

---

[6] Rec. Doc. No. 33-32 at 3, ¶ 11.
[7] *Id.* at 3, ¶ 12.
[8] *Id.*
[9] *Id.* at 3, ¶ 13.
[10] *Id.* at 3-4, ¶ 13.
[11] *Id.* at 4, ¶ 14.
[12] *Id.*
[13] *Id.*
[14] *Id.,* ¶ 15.
Document Number: 48610

employees routinely did – until White targeted Plaintiff for this conduct.[15] Also, Plaintiff was deposed and testified that she "was told" by others that White denied her request to transfer to another division;[16] however, this is hearsay.

Plaintiff claims she reported White's behavior to Growe and to Human Resources Director Nikki Boutte ("Boutte"); however, the alleged harassment only worsened.[17] Although she allegedly complained to Boutte again, Plaintiff claims no action was ever taken to address White's alleged conduct.[18]

The sequence of events that occurred on April 26, 2016 resulted in Plaintiff's termination by Defendant. Plaintiff contends that, on this day, a patron left tips for the Plaintiff and two other employees, Margo Reese ("Reese"), an African-American, and Christina Farrar ("Farrar"), a Caucasian.[19] Plaintiff claims that, despite telling the patron that she and her co-employees were not permitted to accept tips, he insisted and allegedly left three (20) twenty dollar bills on the counter for Plaintiff, Reese, and Farrar.[20] Plaintiff alleges she "picked up the money and distributed the cash to the others."[21] Plaintiff testified that she remembered "taking all the money, bringing it to the back, putting Margo's 20 in her purse, giving Christina her 20 and [Plaintiff] keeping [her] 20."[22] Upon discovery of the $20 bill in her purse, Reese contacted her supervisor, reported the incident, and turned in the money. Plaintiff claims that, after lunch on April 27, she spoke

---

[15] *Id.* at ¶¶ 14-15 .
[16] Rec. Doc. No. 33-27 at 1 (Deposition of Plaintiff p. 66, line 7).
[17] Rec. Doc. No. 33-32 at 4, ¶ 16.
[18] *Id.*, ¶ 17.
[19] *Id.* at 4-5, ¶ 18.
[20] *Id.* at 5, ¶ 18.
[21] *Id.*, ¶ 18.
[22] Rec. Doc. No. 33-11 (Deposition of Plaintiff, p. 90, lines 20-23).
Document Number: 48610

with Growe regarding the incident and subsequently turned in the money.[23]  Plaintiff

argues that Farrar "went home with her tip and did not turn it in until the next day.[24]

Following the tipping incident, Plaintiff contends she and Reese, but not Farrar,

were asked to write a statement about the incident.  Further, Plaintiff claims that neither

Reese nor Farrar were disciplined for the incident.[25]  In contrast, Plaintiff was suspended

and ultimately terminated for violating company policy by taking the tips.[26]  Plaintiff

maintains that, prior to her termination, she was "a model employee," who was never

written up or disciplined for any issues except those involving White.[27]  Plaintiff further

claims she had received several customer service surveys citing her exceptional

service.[28]

Unsurprisingly, Defendant describes the tipping incident and Plaintiff's termination

very differently.  Defendant claims Plaintiff was terminated for knowingly accepting a tip

from a guest in direct violation of company policy.[29]  Defendant also claims Plaintiff

"surreptitiously" accepted the tip and encouraged her co-employees to take the tips, which

Defendant contends was captured on surveillance video[30] and has been submitted to the

Court for review.[31]

Defendant maintains that, on the day in question, the patron placed three twenty

---

[23] Rec. Doc. No. 33-32 at 5, ¶ 19.
[24] Rec. Doc. No. 33 at 4 (citations omitted).
[25] Rec. Doc. No. 33-32 at 5, ¶ 20.
[26] *Id.*, ¶ 21.
[27] *Id.*, ¶ 22.
[28] *Id.*
[29] Rec. Doc. Nos. 32-14 at 2-3; 32-2 at 1; 32-6 at 1; 32-12 at 1; 32-15 at 2; 32-18 at 2; 32-16 at 2; 32-19 at 1; 32-17 at 1; & 32-20 at 1.
[30] Rec. Doc. Nos. 32-15 at 1-2; 32-18 at 2; 32-16 at 1; 32-17 at 1; 32-13 at 27-28; 32-21 at 8-9; & 32-22 at 1-2.
[31] Rec. Doc. No. 31.
Document Number: 48610

dollar bills in front of Plaintiff, Reese, and Farrar.[32]  As reflected by the surveillance video, Reese reached her hand out in a stopping gesture and backed away from the cash.[33] However, Defendant claims Plaintiff grabbed all of the cash from the counter and attempted to "entice" Reese to take the money.[34]  Reese appears to put the money back on the counter and hold her empty hands up to the camera to indicate she did not accept the tip.[35]  Yet, Defendant claims Plaintiff took the bill Reese placed on the counter while Reese moved further from the counter, turned and faced the camera, and gestured once more to signal that she did not accept the money.[36]  While Plaintiff claims Farrar never touched the tip, Defendant contends Plaintiff took the entire sixty-dollar tip to the back room where employees' personal items are stored.[37]  Defendant cites Plaintiff's deposition testimony wherein she described the incident as follows:

> And then [the patron] came back and he was like, 20 for you, 20 for you, 20 for you, and we were all like no, no, no.  And then he was like, yes take it, take it, and I remember taking the money.  I remember Margo putting her hands up and saying, I don't want it or no, I don't have it.  I don't recall exactly what she was saying and I also remember taking all the money, bringing it to the back, putting Margo's 20 in her purse, giving Christina her 20 and me keeping my 20.[38]

Defendant submits Plaintiff offered no explanation for why she picked up all the money and it took it into the back room[39] although she admittedly knew this to be a violation of the no tip policy.[40]

---

[32] Rec. Doc. No. 32-16.
[33] Rec. Doc. Nos. 32-15 at 1-2; 32-18 at 2; 32-16 at 1; & 32-17 at 1.
[34] Rec. Doc. Nos. 32-15 at 1-2; 32-18 at 2; 32-16 at 1; 32-17 at 1; & 32-22 at 1-2.
[35] Rec. Doc. No. 32-16.
[36] Rec. Doc. Nos. 32-15 at 1-2; 32-18 at 2; 32-17 at 1; & 32-23 at 11.
[37] Rec. Doc. No. 32-16.
[38] Rec. Doc. No. 32-13 at 27 (Deposition of Plaintiff, p. 90, lines 14-23)
[39] *Id.* at 30.
[40] Rec. Doc. No. 32-17.
Document Number: 48610

Defendant conducted an investigation of this incident which revealed that, at the time of the incident, Farrar had not received training regarding the tipping policy because she had only attended general orientation at that point in her employment.[41]  Defendant states that, in general orientation, MyChoice employees are not made aware of the no tip policy because some positions that attend the general orientation are allowed to accept tips.[42]  Defendant further states that Farrar, having only been employed by Defendant less than two weeks at the time of the incident, was not terminated for her role in the incident because she had no knowledge of the no tip policy, and she allegedly only accepted the tip at the insistence of the Plaintiff.[43]  Although Farrar was not terminated, she was given a "Final Written Warning," which is the final step before termination.[44]  Defendant claims Reese was not disciplined because the investigation revealed that she did not intend to accept the tip from the guest or from Plaintiff.[45]

Defendant submits the distinction in discipline for Plaintiff was due to "her primary role" in accepting the tip.[46]  This "role," according to Defendant, included taking the $60, putting a $20 bill in Reese's purse without her knowledge or consent, and encouraging other employees to accept the tip, all with the knowledge that it was against company policy.[47]  Defendant also notes that White hired Plaintiff seven months earlier, and she was on the team that made the decision to terminate Plaintiff.[48]

---

[41] Rec. Doc. No. 32-23 at 10 (Deposition of Erica White, pp. 55-56).
[42] *Id.*
[43] Rec. Doc. Nos. 32-23 at 10; 32-15 at 1-2; 32-18 at 2; 32-16 at 1-2; & 32-17 at 1.
[44] Rec. Doc. Nos. 32-23 at 10; 32-11 at 1.
[45] Rec. Doc. Nos. 32-23 at 11; 32-22 at 1-2; & 32-21 at 6-9.
[46] Rec. Doc. Nos. 32-23 at 10-11; 32-14 at 2-3; 32-13 at 28-29; 32-6 at 1; 32-15 at 1-2; 32-18 at 2; 32-16 at 1-2; & 32-17 at 1.
[47] *Id.*
[48] Rec. Doc. Nos. 32-3 at 1; 32-6 at 1; 32-23 at 10;& 32-13 at 28-29, 33.
Document Number: 48610

Defendant rejects Plaintiff's characterization that, outside of the tipping incident, she was a "model employee." Defendant points to instances of Plaintiff's discipline prior to the tipping incident.[49] Defendant contends customer complaints were made against Plaintiff for her "demeanor and surly attitude."[50] Defendant also presents evidence confirming that White counseled Plaintiff after finding Plaintiff logged into her Facebook page from a company computer.[51]

Following her termination, Plaintiff filed an EEOC Charge against Defendant with the Louisiana Commission of Human Rights alleging race discrimination and retaliation.[52] Plaintiff filed this lawsuit alleging race discrimination, hostile work environment, and retaliation in violation of Title VII of the Civil Rights Act of 1964.[53] Defendant now moves for summary judgment arguing that Plaintiff's claims of race discrimination, hostile work environment, and retaliation are without merit and should be summarily dismissed.

## II.     LAW & ANALYSIS

### A.  Summary Judgment Standard

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[54] "When assessing whether a dispute to any material fact exists, we consider all of the evidence in the record but refrain from making credibility determinations or weighing the evidence."[55] A party moving for summary judgment "must 'demonstrate the absence

---

[49] Rec. Doc. No. 32-13 at 31.
[50] Rec. Doc. Nos. 32-13 at 4, 6, 31-32, 35-43; 32-2 at 1-3; 32-8 at 1-13; 32-23 at 5-9; & 32-24 at 3.
[51] Rec. Doc. Nos. 32-7 at 1; 32-23 at 4.
[52] Rec. Doc. No. 33-16.
[53] 42 U.S.C. § 2000e, *et seq.*
[54] Fed. R. Civ. P. 56(a).
[55] *Delta & Pine Land Co. v. Nationwide Agribusiness Ins. Co.*, 530 F.3d 395, 398-99 (5th Cir. 2008).
Document Number: 48610

of a genuine issue of material fact,' but need not negate the elements of the nonmovant's case."[56]  If the moving party satisfies its burden, "the non-moving party must show that summary judgment is inappropriate by setting 'forth specific facts showing the existence of a genuine issue concerning every essential component of its case.'"[57]  However, the non-moving party's burden "is not satisfied with some metaphysical doubt as to the material facts, by conclusory allegations, by unsubstantiated assertions, or by only a scintilla of evidence."[58]

Notably, "[a] genuine issue of material fact exists, 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'"[59]  All reasonable factual inferences are drawn in favor of the nonmoving party.[60]  However, "[t]he Court has no duty to search the record for material fact issues. Rather, the party opposing the summary judgment is required to identify specific evidence in the record and to articulate precisely how this evidence supports his claim."[61]  "Conclusory allegations unsupported by specific facts … will not prevent the award of summary judgment; 'the plaintiff [can]not rest on his allegations … to get to a jury without any "significant probative evidence tending to support the complaint."'"[62]

---

[56] *Guerin v. Pointe Coupee Parish Nursing Home*, 246 F.Supp.2d 488, 494 (M.D. La. 2003)(quoting *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994)(en banc)(quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-25, 106 S.Ct. at 2552)).

[57] *Rivera v. Houston Independent School Dist.,* 349 F.3d 244, 247 (5th Cir. 2003)(quoting *Morris v. Covan World Wide Moving, Inc.*, 144 F.3d 377, 380 (5th Cir. 1998)).

[58] *Willis v. Roche Biomedical Laboratories, Inc.,* 61 F.3d 313, 315 (5th Cir. 1995)(quoting *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994).

[59] *Pylant v. Hartford Life and Accident Insurance Company*, 497 F.3d 536, 538 (5th Cir. 2007)(quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)).

[60] *Galindo v. Precision American Corp.*, 754 F.2d 1212, 1216 (5th Cir. 1985).

[61] *RSR Corp. v. International Ins. Co.*, 612 F.3d 851, 857 (5th Cir. 2010).

[62] *Nat'l Ass'n of Gov't Employees v. City Pub. Serv. Bd. of San Antonio, Tex.*, 40 F.3d 698, 713 (5th Cir. 1994)(quoting *Anderson*, 477 U.S. at 249).
Document Number: 48610

**B. Title VII Race Discrimination – Termination**

Plaintiff claims that her termination was based on her race in violation of Title VII. To prove race discrimination under Title VII, Plaintiff must establish that she is (1) "a member of a protected class" (2) "was qualified for the position" (3) "was subjected to an adverse employment action"; and (4) "other similarly situated persons were treated more favorably."[63] If Plaintiff establishes a *prima facie* case of discrimination, the burden shifts to the Defendant to articulate a legitimate, non-discriminatory reason for the adverse actions taken against her. [64] If the Defendant satisfies this burden of production, the burden shifts back to Plaintiff, who must "offer sufficient evidence to create a genuine issue of material fact 'either (1) that the defendant's reason is not true, but is instead a pretext for discrimination (pretext alternative); or (2) that the defendant's reason, while true, is only one of the reasons for its conduct, and another motivating factor is the plaintiff's protected characteristic (mixed-motive[s] alternative).'"[65] Plaintiff proceeds under a pretext theory in this case.[66]

1. <u>Similarly Situated Comparators</u>

Turning to Plaintiff's *prima facie* case of race discrimination, it is undisputed that Plaintiff satisfies the first three prongs. However, Plaintiff has failed to satisfy prong four in that she has failed to identify a proper comparator—someone "similarly situated" who was "treated more favorably" than she.[67] The law is clear that, "[i]n the context of a race

---

[63] *Septimus v. Univ. of Hous.*, 399 F.3d 601, 609 (5th Cir. 2005).
[64] *Lee v. Kansas City Southern Ry. Co.*, 574 F.3d 253, 259 (5th Cir. 2009)
[65] *Rachid v. Jack In The Box, Inc.*, 376 F.3d 305, 312 (5th Cir. 2004); *see also Vaughn v. Woodforest Bank*, 665 F.3d 632, 637 (5th Cir. 2011) (citing same in the context of a Title VII race discrimination case).
[66] Rec. Doc. No. 33 at 11.
[67] *Septimus* , 399 F.3d at 609.
Document Number: 48610

discrimination claim where the plaintiff alleges that employees who were not members of the protected class received more [favorable treatment], the plaintiff must come forward with **specific evidence** of comparators who were similarly situated."[68]  Courts within the Fifth Circuit define "similarly situated" narrowly.[69]  In evaluating whether an alleged comparator is similarly situated,

> "The employment actions being compared will be deemed to have been taken under nearly identical circumstances when the employees being compared held the same job or responsibilities, shared the same supervisor [,] or had their employment status determined by the same person[.]"[70] "Employees with different supervisors, who work for different divisions of a company ... generally will not be deemed similarly situated." The Fifth Circuit has further explained, that "employees who have different work responsibilities ... are not similarly situated."[71]

Plaintiff identifies Farrar as her similarly situated comparator.  As set forth above, Farrar is a Caucasian female who was involved in the tipping incident and also "received the tip."[72]  Plaintiff notes that she and Farrar held the same job title, had the same job duties,[73] and both were supervised by Growe and White.[74]  Because Farrar and Plaintiff both took the tip, but only Plaintiff was terminated, Plaintiff contends she has established a *prima facie* case of race discrimination.

Defendant does not challenge that Farrar and Plaintiff are similarly situated in

---

[68] *Corley v. Louisiana ex rel. Div. of Admin., Office of Risk Mgmt*, 816 F.Supp.2d 297, 316 (M.D. La. 2011)(citing *Lee v. Kansas City Southern Ry. Co.*, 574 F.3d 253, 259–60 (5th Cir. 2009))(emphasis added).
[69] *See Horton v. G4S Secure Solutions (USA), Inc.*, No. 16-544-SDD-EWD, 2018 WL 1997535 at *5 (M.D. La Apr. 27, 2018)(citing
*Brown v. Bd. of Trustees Sealy Indep. Sch. Dist.*, 871 F.Supp.2d 581, 593 (S.D. Tex. 2012); *see also Lopez v. Kempthorne,* 684 F. Supp. 2d 827, 856-57 (S.D. Tex. 2010)).
[70] *Id.* (quoting *Turner v. Kansas City S. Ry. Co.*, 675 F.3d 887, 893 (5th Cir. 2012)(quoting *Lee v. Kan. City S. Ry. Co.*, 574 F.3d 253, 260 (5th Cir. 2009))).
[71] *Id.* (quoting *Lee*, 574 F.3d at 259 (citing *Wyvill v. United Cos. Life Ins.*, 212 F.3d 296, 302 (5th Cir. 2000)).
[72] Rec. Doc. No. 33 at 9.
[73] *See* Rec. Doc. No. 33-7 (Deposition of Erica White, p. 60).
[74] Plaintiff cites to the Deposition of Nakisha Growe, Rec. Doc. No. 33-8 (Depo p. 9), but this document does not reference supervision of Farrar.
Document Number: 48610

terms of job title, duties, and supervisors.  However, Defendant maintains that Farrar had only been employed for two weeks and had not yet received full training at the time of the tipping incident; thus, Defendant argues this fails to satisfy the requirement that the comparators have the same employment action taken under "nearly identical circumstances."  Defendant submits evidence showing that Farrar had only worked two shifts prior to the tipping incident and, at the time, she had attended only the general orientation provided by the company which did not include specific training on tipping.[75]

Because Defendant reasonably believed Farrar had not been informed of the tipping policy, she was not terminated.  Nevertheless, her role in the incident resulted in a Final Notification Record of Counseling, which is a severe disciplinary action just one step short of termination.[76]  Thus, Defendant claims that Farrar is not a proper comparator as the law requires that a similarly situated employee be subject to "the same standards governing conduct and discipline … without any differentiating or mitigation circumstances."[77]

In addition to the above mitigating or different circumstances, Defendant contends Farrar is also an improper comparator as she and Plaintiff did not have comparable violation histories.  As set forth above, Defendant has demonstrated several occasions where Plaintiff was disciplined for violations of company policy.    Plaintiff challenges Defendant's reference to her "history of poor customer relations" as a distinguishing factor and cites the deposition testimony of Growe, who testified that Farrar had also received

---

[75] Rec. Doc. No. 36-1 (Declaration of Kizzy Smith, Human Resources Director of Defendant); Rec. Doc. No. 36-2.
[76] Rec. Doc. No. 32-11.
[77] Rec. Doc. No. 36 at 8 (quoting *Johnson v. Alice Indep. Sch. Dist.*, 12-170, 2012 WL 4068678, at *4 (S.D. Tex. Sept. 14, 2012))(internal quotations and citations omitted).
Document Number: 48610

customer complaints.[78]

Plaintiff also contends that she had never been formally trained on Defendant's tipping policy but had only been made aware of it from other employees. Thus, she claims both she and Farrar had a lack of formal or official training regarding Defendant's tipping policy. Plaintiff claims other MyChoice representatives also testified or attested that they were never formally trained regarding Defendant's tipping policy but only learned of it from other employees. Reese testified that she knew they were not allowed to accept tips "[j]ust from being on the floor, from management, and everybody else, I mean, that worked in that position that told us we couldn't take tips."[79] Shametris Lovely, Plaintiff's co-worker during the relevant time period, attested that "[t]he tipping policy was never discussed during orientation. The policy was never discussed by HR or management;" she learned of the policy "from other workers when she started the actual position."[80]

Thus, Plaintiff maintains that she and Farrar were similarly situated, had the same level of training regarding tipping, and "Farrar accepted the tip in the same manner that the Plaintiff did;"[81] yet, Farrar was not terminated like Plaintiff.

The Court finds that Farrar is not a similarly situated comparator. First, it is undisputed that Plaintiff had been employed seven months at the time of the tipping incident as compared to Farrar's two weeks. Second, it is undisputed that Plaintiff was fully aware that it was against company policy to receive tips. This is demonstrated throughout the record by evidence submitted by both Plaintiff and Defendant. Plaintiff's

---

[78] Rec. Doc. No. 33-20 at 1 (Deposition of Nakisha Growe, p. 16).
[79] Rec. Doc. No. 32-21 at 2 (Deposition of Margo Reese, p. 23).
[80] Rec. Doc. No. 33-14 at 1 (Affidavit of Shametris Lovely, ¶ 3).
[81] Rec. Doc. No. 33 at 11.
Document Number: 48610

*First Amending Complaint* alleges that "[t]he Plaintiff informed the business owner, that they were not allowed to take tips but, the business owner insisted."[82]  Growe, Plaintiff's direct supervisor, testified that Defendant maintains a tipping policy that was enforceable during Plaintiff's employment, and she confirmed that managers train employees within their department on the tipping policy rather than provide a formal written policy for an employee's signature.[83] Growe was asked if she trained Plaintiff on Defendant's tipping policy, and she testified:  "I can't tell you directly when, but yes, at some point I've said to everybody, you know, we cannot accept tips."[84] Moreover, despite knowledge of the policy, Plaintiff admitted in her deposition that she took the tips and distributed them by placing a bill in Reese's purse, handing Farrar a bill, and keeping a bill for herself.[85]

Particularly fatal to Plaintiff's claim is the surveillance video that captured the entire tipping incident.  Defendant submitted the *Declaration* of Fenton Morgan Lipscomb ("Lipscomb"), Surveillance Supervisor at L'Auberge casino since 2013, who declared under oath that, as the custodian of surveillance footage and case log reports, he regularly reviews and prepares surveillance footage for Defendant.[86]  Lipscomb further declared that White requested a surveillance review of the tipping incident regarding Plaintiff which revealed Plaintiff accepting a tip from a patron on April 26, 2016 in violation of company policy.[87]  Lipscomb prepared a surveillance report with the following findings:

---

[82] Rec. Doc. No. 7 at 5, ¶ 18.

[83] Rec. Doc. No. 32-24 at 5 (Deposition of Nakisha Growe, pp. 22-23).  Growe testified that there was an internet usage policy that employees were required to read and sign.

[84] *Id.* (Deposition of Nakisha Growe, p. 24, lines 3-5).  Growe also described such a situation:  "If a guest were to drop $10 on the floor, you know, they know, hey, we cannot touch it, you cannot accept tips.  You would call security.  It it's left on the counter, if we see it on the floor, if we see it by the escalator, contact either your manager or contact security if you're near a phone." *Id.* at lines 5-11.

[85] Rec. Doc. No. 32-13 at 27.

[86] Rec. Doc. No. 32-15 at 1 (Declaration of Fenton Lipscomb, ¶¶ 1-4).

[87] *Id.* at 1-2 (Declaration of Fenton Lipscomb, ¶¶ 5-6).

Document Number: 48610

MyChoice Manager White requested a review in response to a report that MyChoice Representative Daja Nathan had accepted $60 in cash from a patron. White requested that Surveillance attempt to determine whether Nathan had accepted any cash and whether she'd distributed it amongst the other representatives. Upon review, at 1550 hours, a white, male patron was observed placing what appeared to be three $20 bills, one in front of each of the representatives working there, on the MyChoice counter on the casino floor. The guest left the area immediately afterward. Initially, the representatives didn't accept the cash, but a few seconds later, **Nathan collected all three bills and attempted to hand them to the other two representatives, Margot Reese and Christina Farrar. Both Reese and Farrar refused to accept the cash at that time** and Reese held her hands up to the camera as though she was showing that she hadn't taken it. Nathan then took the cash into the storage room in the MyChoice office, where she left it on the counter. She returned with Farrar at 1556 hours and, at that time, **handed Farrar one of the bills**, which Farrar placed into a black bag on the counter. White had advised during her initial review request that Nathan had supposedly placed some of the cash into the purse of one of the other representatives and some more under the coffee cup of another. Nathan wasn't observed placing anything into anybody else's purse, but she was observed placing something under a coffee mug on top of the file cabinet in the office at 15:56:41 hours. Review results verified by Supervisor Lipscomb. White was notified of the results of the review. She was unsure at the time what action would be taken.[88]

Director of Surveillance Jerod Emrick ("Emrick") also submitted a sworn *Declaration* wherein he confirmed the same surveillance review taken by Lipscomb at the request of White.[89] Emrick also submitted the surveillance log report, with the same language and findings set forth in that provided by Lipscomb,[90] and Emrick confirmed that the surveillance case log report and footage are true and correct copies of same.[91]

Defendant conventionally filed the surveillance video with the Court, and the Court had several opportunities to review the footage. In the Court's view, while the Court finds

---

[88] Rec. Doc. No. 32-16 at 1 (emphasis added).
[89] Rec. Doc. No. 32-18.
[90] Rec. Doc. No. 32-19.
[91] Rec. Doc. No. 32-18 at 2 (Declaration of Jerod Emrick at 2, ¶¶ 8-9).
Document Number: 48610

that the surveillance team's log reports generally accurately reflect the sequence of events in the surveillance video, the Court observed that Farrar initially took the bill placed in front of her, but it appears that Plaintiff subsequently removed the bill from Farrar's hands. Plaintiff then attempts to give Reese a bill, but she clearly refuses. The Court further observed Plaintiff later enter a storage room and place what appears to be money in a brown purse, then she hands Farrar a bill, which Farrar accepts. Both Reese and Plaintiff testified that Plaintiff did, in fact, place the $20 bill in Reese's purse. Additionally, Reese testified that she did not discover the $20 bill until later when she left work.[92]

It is undisputed that Plaintiff never contacted security or returned the tip to management until she was confronted the following day, and only after Reese returned and reported the $20 left in her purse. In her deposition, Reese was asked if she was angry that Plaintiff had placed the $20 in her purse because she knew it was wrong; Reese answered "Yes."[93] Growe also testified to her understanding of the tipping incident and Plaintiff's knowledge of wrongdoing:

> To my understanding, Margo was the first person to be like, no, don't want it, can't accept tips. And then Daja took the money, brought it to the back. I don't know when she put it in Margo's purse, don't know when Christina came and she got it, but I do know that when Margo got off at 4:30, she called me and she said – she waited until she clocked out and she said, please come and meet me by the time clock, which was again weird because they had just left me in the office. So, called me when she got to the time clock and she said here, take this money, she said I told Daja I didn't want it, she put it in my purse, I know we can't accept tips. And I reported it to Erica.[94]

Plaintiff fails to offer any competent summary judgment evidence to controvert the

---

[92] Rec. Doc. No. 32-21 at 10 (Deposition of Margo Reese, p. 44).
[93] *Id.* at 10-11 (Deposition of Margo Reese, p. 45, line 4).
[94] Rec. Doc. No. 32-24 at 5 (Deposition of Nakisha Growe, p. 24, lines 24-25 through p. 25, lines 1-13).
Document Number: 48610

evidence presented by Defendant.

Accordingly, for the reasons set forth above, the Court finds that Farrar is not a similarly situated comparator for Plaintiff considering Farrar's lack of training and experience on the job and Plaintiff's primary, culpable role in the tipping incident. Farrar and Plaintiff were not disciplined differently under "nearly identical circumstances." Because Plaintiff has failed to point to a proper, similarly situated comparator, she has failed to establish a *prima facie* case of race discrimination. Although the Court need not go further, assuming *arguendo* that Plaintiff could establish a *prima facie* case of race discrimination, she has failed to overcome Defendant's legitimate, nondiscriminatory reason for her termination with pretext evidence suggestive of race discrimination.

## 2. Legitimate, Non-discriminatory Reason for Termination

Defendant has presented a legitimate, non-discriminatory reason for terminating Plaintiff. Defendant maintains that it investigated the tipping incident, determined that Plaintiff took all of the money, placed some money in another employee's purse without permission, handed a third employee some of the money, and only "confessed" when she was essentially caught – after learning that Reese had reported the tip. Because this is a legitimate, non-discriminatory reason for Plaintiff's termination, the burden would shift to Plaintiff to demonstrate that Defendant's proffered reasons are a mere pretext for race discrimination.

## 3. Pretext

Plaintiff offers several arguments in an attempt to demonstrate pretext; however, Plaintiff fails to carry this burden. First, Plaintiff claims the Defendant cannot provide any written proof that the tip policy was furnished to MyChoice Representatives, including

Plaintiff. However, written proof of Plaintiff's notice of the tipping policy is irrelevant and immaterial to the issues before the Court where, as here, Plaintiff has admitted that she knew accepting such tips violated company policy, and Growe's testimony that she trained Plaintiff regarding this policy is uncontroverted. Further, Plaintiff cites no legal authority for the proposition that an employer must submit written evidence that an employee was trained in defending a Title VII case.

Plaintiff also claims Defendant cannot prove that she "incited" any party to accept any tip.[95] This argument is directly controverted by the surveillance video viewed by Defendant's investigators and this Court. The footage clearly reveals that Plaintiff attempted to place a $20 bill in Reese's hand, later placed $20 in Reese's purse, and placed a $20 bill in Farrar's hands. Indeed, Plaintiff removed all the money from the counter and she distributed the money to her co-workers, one of whom she knew had expressly rejected the tip.

Plaintiff contends Reese testified that she was never "formally" told that she was not allowed to receive tips.[96] As stated above, whether training was "formally" given or not, Reese testified that she was aware that MyChoice representatives were not allowed to receive tips, and she was angry that Plaintiff attempted to make her culpable in the tipping incident.[97]

Next, Plaintiff argues that the "most compelling" proof of pretext is the testimony of Boutte who testified that, if you reported a tipping incident, you would not be disciplined or terminated. Boutte was asked if a MyChoice representative received a tip from an

---

[95] Rec. Doc. No. 33 at 11-12.
[96] *Id.* at 12.
[97] *See supra* footnotes 94 & 95.
Document Number: 48610

aggressive patron but immediately reported the tip, would that employee be disciplined. Boutte responded: "No, because you did the right thing, you followed the steps. You reported it, security or the manager has taken it or given it to security and then they, as we stated earlier, did the paid-in."[98] Boutte was then asked if discipline would follow if an employee received a tip, took it home, but immediately reported it the next day. Boutte responded:

> I would say no, because you turned in the tip. You should have reported it sooner, we don't have a policy that states you have to – we say immediately, so immediately could be vague for anyone. An hour, 30 minutes, five minutes. But they know they need to turn it in immediately. So if you're using an example as an hour, I received this tip, I'm turning it in. You didn't leave with it, okay, the manager and security will come in and get it through the paid-in. But we will probably do what you call a coaching conversation and say hey team member, just know, when you receive this tip you are to immediately get your manager or your supervisor to report it as soon as you get it. So it would not be disciplined, but just an FYI for future situations.[99]

Acknowledging Boutte's testimony regarding Plaintiff's culpability, Plaintiff argues that Boutte changed her story when specifically asked about Plaintiff.[100] Plaintiff claims Boutte's responses are inconsistent, and she did not treat Plaintiff the way she described an employee would be coached rather than disciplined since Plaintiff turned in the tip the following day.

Contrary to Plaintiff's characterization, Boutte's testimony demonstrates her belief that Plaintiff's conduct in the tipping incident did not fall under the more innocent hypotheticals presented above:

> Q: No question in your mind, based upon the investigation, that Daja Nathan took the tips – well, took her tip and intended to keep that money, right?

---

[98] Rec. Doc. No. 33-10 (Deposition of Nicotra Boutte, p. 32, lines 5-9).
[99] *Id.* (Deposition of Nicotra Boutte, p. 32, lines 15-25 through p. 33).
[100] Rec. Doc. No. 33 at 13.
Document Number: 48610

| | |
|---|---|
| A: | Right, she intended to keep it. |
| Q: | This wasn't a situation where she was aware of the policy and she intended to return it to management as soon as she was able to do so. |
| A: | Correct, she did not do that. |
| Q: | Okay.  She may have returned it later on in the day, but that was only because - - |
| A: | She got caught? |
| Q: | -- she got caught? |
| A: | Yes.[101] |

The Court finds no inconsistencies in Boutte's testimony.  Notably, Plaintiff does not challenge the veracity of Boutte's testimony that Plaintiff did not voluntarily report the tip but rather turned it in only after she was "caught;" rather, Plaintiff maintains that Farrar was also "caught" and, thus, should have also been terminated.  Remarkably absent from Plaintiff's pretext argument or evidence is an explanation why Plaintiff took the money and distributed it to her co-workers rather than immediately reporting the tips to security as she knew was required.  Plaintiff has not offered any summary judgment evidence that would mitigate against her role in the tipping incident or explain why Defendant's investigation as to her culpability was incorrect.  She simply doubles down on the meritless argument that, because she was terminated, Farrar should also have been terminated.  Defendant has submitted reasonable, legitimate reasons for its decision to terminate Plaintiff and discipline Farrar, and the record is completely devoid of evidence that these business determinations were a pretext for race discrimination.

Particularly fatal to Plaintiff's pretext claims, there is absolutely no evidence that any of Defenadant's actions were taken on the basis of Plaintiff's race.  Plaintiff utterly ignores the fact that both Growe and Boutte, who made determinations as to Plaintiff's

---

culpability in this matter, are African-American females.  Indeed, Boutte was asked to explain her recollection of the tipping incident and why she determined that Plaintiff should be terminated:

> Well, clearly because she took it and was clear that she knew she was not supposed to take it.  And then for her to go in and put the money in another team member's personal item without her knowledge or permission granting her, the permission to put it in her purse was a no, because she shouldn't have been going through her personal items, and for her to tell her, you know, we're not supposed to take this money, you took it anyway, it's not worth losing your job over, what she states, because you can lose your job over taking a tip, clearly shows that she did understand that she wasn't supposed to take that tip, and she was supposed to report it.[102]

White (Caucasian), Growe (African-American), and Boutte (African-American) all held supervisory or managerial positions over Plaintiff.  The record evidence establishes that all three determined that Plaintiff knowingly and intentionally violated the tipping policy and that she should be terminated.  There is no summary judgment evidence before the Court demonstrating that Plaintiff's race in any way played a role in her termination.  Furthermore, whether the Court views Defendant's investigation, determinations, and employment decisions as to Plaintiff as wrong or incorrect is not the issue.  The only question before the Court is whether the Defendant's findings and decisions were illegally motivated by Plaintiff's race.  The Fifth Circuit cautions that courts are not in the business of second guessing business judgments,[103] and the Court declines to do so here.

There being no material issues of fact in dispute, the Court finds that Defendant is entitled to summary judgment on Plaintiff's race discrimination claim.

---

[102] Rec. Doc. No. 28-16 at 2 (Deposition of Nicotra Boutte, p. 40, lines 15-25 through p. 41, lines 1-3).
[103] *Walton v. Bisco Indus. Inc.*, 119 F.3d 368, 372 (5th Cir.1997).
Document Number: 48610

### C. Title VII Hostile Work Environment & Retaliation

In her *Opposition*, Plaintiff failed to respond, address, or even mention her hostile work environment and retaliation claims.[104] Notably, Plaintiff fails to provide summary judgment evidence to establish a *prima facie* case for either of these claims. Accordingly, these claims are deemed abandoned, and Defendant is entitled to summary judgment on both claims. The law is clear that "[f]ailure to address a claim in response to a defendant's summary judgment motion constitutes abandonment of the claim."[105] Moreover, the Court notes that Plaintiff's hostile work environment and retaliation claims would likely fail on the merits for the same lack of competent summary judgment evidence demonstrating a racial pretext for Defendant's employment actions as explained above regarding her race discrimination claim.

## III. CONCLUSION

For the reasons set forth above, the *Motion for Summary Judgment*[106] filed by Defendant is GRANTED. Plaintiff's case is dismissed with prejudice. The Pretrial Conference set for November 27, 2018, and the Jury Trial set to begin on December 10, 2018 are hereby CANCELED. *Judgment* shall be entered accordingly.

**IT IS SO ORDERED.**

Baton Rouge, Louisiana, this 14th day of November, 2018.

_____
**SHELLY D. DICK**
**CHIEF DISTRICT JUDGE**
**MIDDLE DISTRICT OF LOUISIANA**

---

[104] A single reference to retaliation appears in Rec. Doc. No. 33 at 5.
[105] *Valenza v. Wal-Mart Stores, Inc.*, No. 16-2469, 2016 WL 7407178 at * 4 (E.D. La. Dec. 22, 2016)(quoting *Vela v. City of Houston*, 276 F.3d 659, 678-79 (5th Cir. 2001)).
[106] Rec. Doc. No. 32.
Document Number: 48610